IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

JASON GOODMAN,

        **Plaintiff,**

v.                                  **Case No.:** 5:23-cv-00266

THE UNITED STATES OF AMERICA,

        **Defendant**

## COMPLAINT

COMES NOW Plaintiff, by undersigned counsel, and for his Complaint in this civil action states as follows:

## PARTIES

1.      Plaintiff is a resident of Mercer County, West Virginia.

2.      At time relevant hereto, Jonathan Yates ["Yates"] was a doctor of osteopathic medicine employed and/or credentialed at the Beckley VA Medical Center ["Beckley VAMC"].

3.      On October 29, 2020, the West Virginia Board of Osteopathic Medicine entered a Consent Order which permanently revoked Yates' license to practice osteopathic medicine and surgery in the state of West Virginia.

4.      The Consent Order was consistent with the requirements of Yates' criminal Plea Agreement with the United States of America,

5.      Plaintiff was a former patient of Yates at the Beckley VA Medical Center through its Whole Health Clinic.

6.      Upon information and belief, the Beckley VAMC was the employer of Yates at all times relevant hereto and is vicariously liable for the acts and/or failures of Yates as set forth herein.

1

7.      Upon information and belief, under the MPLA, Yates lacks over one million in liability coverage and vicarious liability against the Beckley VAMC is proper.

## JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper in the United States District Court for the Southern District of West Virginia.

9.      Plaintiff has complied in all manners with the notice requirements of the Federal Tort Claims Act.

## FACTS

10.     Plaintiff's military service entitled Plaintiff to receive medical treatment at the Beckley VAMC.

11.     Beckley VAMC [sometimes hereinafter "the facility"] offers its services to more than thirty-eight thousand veterans living in an eleven-county area in Southern West Virginia.

12.     More than twelve-thousand veterans are enrolled in the Beckley VAMC health care system.

13.     Beckley VAMC holds itself out as an institution that "has been improving the health of the men and women who have so proudly served our nation" since 1951.

14.     Beckley VAMC's stated vision is "[t]o be a trusted, resilient partner for Veterans, offering readily available, safe and compassionate care of exceptional quality within an integrated system."

15.     Beckley VAMC touts its core values as being integrity, commitment, advocacy, respect, and excellence.

16.     Every veteran that receives healthcare from the Beckley VAMC and its providers is deserving of the compassionate care and excellent quality touted by the Beckley VAMC's vision statement.

17.     Every veteran that receives healthcare from the Beckley VAMC and its providers is deserving of the integrity, commitment, advocacy, respect, and excellence that the Veteran's Administration and the Beckley VAMC alleges are its core values.

18.     In July of 2018, Beckley VAMC began offering health and wellness services through a new program titled "Whole Health."

19.     According to the Beckley VAMC web page "Whole Health (WH) is an approach to health care that empowers and equips everyone to take charge of their health and well-being and to live their life to the fullest."[1]

20.     Whole Health was intended to incorporate components of proactive health and well-being for Veterans.

21.     Yates was hired and/or credentialed by the Beckley VAMC to provide healthcare to Veterans through the Whole Health Program.

22.     Yates was employed at the Beckley VAMC from April 29, 2018, through July 23, 2019, as a Doctor of Osteopathic Medicine and as the Whole Health Medical Director.

23.     Yates was credentialed and privileged to practice within the primary care service line, which included the ability to perform osteopathic manipulation treatment.

---

[1] https://www.beckley.va.gov/services/Whole_Health.asp

3

24.     Between April 1, 2019, and May 31, 2019, the former Associate Director for Patient Care Services ["ADPCS"], Debra "Lynn" Legg, became aware of three sexual assault allegations against Yates at the facility.[2]

25.     In August 2018, the Officer of the Inspector General ["OIG"] published a report, *Comprehensive Healthcare Inspection Program Review of the Beckley VA Medical Center, West Virginia* [the "Report"].

26.      With respect to renewal of privileges, the OIG found that multiple providers had "no evidence of complete service-specific data collection, resulting in providers continuing to deliver care without a thorough evaluation of their practice."

27.     The OIG recommended that the Chief of Staff, Dr. Mark Harris, ensure that service line managers consistently collect and review professional practice evaluation data and monitor compliance.[3]

28.     The OIG made eight recommendations:[4]

a.  The Chief of Staff ensures that service line managers consistently collect and review Ongoing Professional Practice evaluation data and monitors compliance

b.  The Chief of Staff ensures that service line managers collect Ongoing Professional Practice Evaluation data utilizing assessments by providers with similar training and privileges and monitors compliance

c.  The Associate Director ensures environment of care rounds are conducted at the required frequency and documented in the Comprehensive Environment of Care Assessment and Compliance Tool and monitors compliance

[2] VAH Directive 1351, *Staffing Methodology for VHA Nursing Personnel,* December 20, 2017. The ADPCS is responsible for oversight of facility nursing personnel and is a member of the facility executive team.
[3] "Leadership Team," Beckley VA Medical Center, accessed October 4, 2021, https://www.beckley.va.gov/about/leadership.asp. The Chief of Staff is responsible for all clinical operations at the Beckley VAMC and two community clinics.
[4] VA OIG, *Comprehensive Healthcare Inspection Program Review of the Beckley VA Medical Center, West Virginia,* Report No. 17-05401-240, August 13, 2018.

4

     d.  The Associate Director ensures required team members participate on environment of care rounds and that attendance is recorded in the Comprehensive Environment of Care Assessment and Compliance Tool and monitors compliance.

     e.  The Facility Director ensures that deficiencies identified on the Annual Physical Security Survey are corrected and monitors compliance

     f.  The Facility Director ensures that the controlled substances inspectors consistently perform controlled substances order verification as required and monitors compliance

     g.  The Chief of Staff ensures that mammogram results are electronically linked to the radiology orders and monitors compliance

     h.  The Associate Director for Patient Care Services ensures that nursing staff involved in managing central lines receive the required central line-associated bloodstream infection prevention education and monitors compliance

29.    Following the criminal conviction and sentencing of Yates, on August 16, 2021, the OIG initiated a healthcare inspection to review:[5]

     a.  oversight of Yates including credentialing, privileging, and professional practice evaluations,

     b.  facility leaders' awareness and response to allegations of sexual assault,[6]

     c.  facility leaders' awareness and response to Yates's practice of acupuncture without proper credentials and privileges, and

     d.  Yates' access to needles.[7]

30.    The OIG interviewed VHA; VISN, Robert Walton; Chief Medical Officer, Dr. Raymond Chung; current and former facility senior level executives; the Risk Manager, Karen

---

[5] The OIG awaited the conclusion of the criminal investigation before initiating a healthcare inspection. Dr. Yates was sentenced on January 25, 2021. "Former Veterans Affairs Doctor Sentenced to Prison for Sexual Abuse of Veterans."

[6] For the purposes of this report, the OIG considered facility leaders to include senior level executives and service chiefs.

[7] For the purposes of this report, the OIG considered needles to be acupuncture and trigger point needles.

Thorn; the Patient Safety Manager; the Whole Health Program Manager, Oliva Honaker; the Credentialing and Privileging Specialist; a patient advocate; an inventory management specialist; and staff physicians who assisted in the facility review of Dr. Yates's patient care.

31.     The OIG interviewed former employees including an Assistant Human Resources Officer; an Executive Assistant to the Facility Director; the Whole Health Program Manager; a Whole Health Nurse; an Infection Control Nurse; and a Whole Health Program Support Assistant.[8]

32.     The OIG reviewed VHA directives and handbooks, external standards, guidelines, and professional literature. The OIG reviewed facility policies and procedures, medical staff bylaws, internal VISN and facility reviews, facility reports of contact, meeting minutes, administrative investigations and action plans, credentialing and privileging documents, staff emails, issue briefs, Yates' onboarding documents, focused professional practice evaluations (FPPE) and ongoing professional practice evaluations (OPPE), VA Police reports, and needle purchase requests.[9]

33.     The OIG reviewed the April 2018 – April 2019 Professional Standards Board (PSB) and Clinical Executive Board committee meeting minutes.

34.     The OIG also conducted an independent electronic health record (EHR) review and analysis related to Yates's provision of care from April 29, 2018, through July 23, 2019.[10]

---

[8] VHA leaders included the Executive and Deputy Directors from the Office of Patient Centered Care and Cultural Transformation and the National Lead for Acupuncture. VISN leaders included the Network Director, the Chief Medical Officer, and the Quality Management Officer. Facility senior level executives included a former Facility Director, a former Acting Facility Director, the current and former ADPCS, the current and former Chief of Staff, the Chief, Primary Care, and the current and former Quality Management Chiefs. The former Whole Health Program Manager served in that role as a collateral duty, but was generally recognized as the Program Manager, including by the former ADPCS.

[9] VHA Handbook 1100.19, *Credentialing and Privileging,* October 15, 2012. This handbook was in effect at the time of the events discussed in this report until it was partially rescinded and replaced by VHA Directive 1100.20, *Credentialing of Health Care Providers*, September 15, 2021. The two policies contained the same or similar language related to FPPE's and OPPE's Medical staff leaders use an FPPD to evaluate the specific privileges and competency of providers. An OPPE is used to provide ongoing medical staff leaders' monitoring of provider privileges.

[10] Yates was employed by the facility from April 29, 2018, through July 23, 2019.

35.     The OIG also used a software application to analyze relevant individual's emails related to leaders' awareness and response to patient safety concerns including performance of acupuncture and allegations of sexual assault.

36.     The OIG determined Yates, a Doctor of Osteopathic Medicine, was appropriately credentialed and privileged at the facility to practice within the primary care service line with a specialty in family practice.

37.     However, Yates was not credentialed and privileged to perform acupuncture and was not clinically supervised per VHA policy.

38.     Credentialing is a systematic process of screening and evaluating a provider's qualifications and other credentials including licensure, required education, and relevant training and experience.

39.     Privileging refers to the process of approving a provider's procedures and services.

40.     VHA requires clinical privileges be facility, service, and provider specific and are based on "clinical competence as determined by peer references, professional experience, health status, education, training, and licensure."[11]

41.     VHA and facility policies require physician applicants to undergo a credentialing process, which includes verification of experience, training, education, professional references, previous state licensing board (SLB) complaints, malpractice complaints, and licensure through an application called VetPro.[12]

42.     To complete the credentialing and privileging process facility policy requires certain actions:

---

[11] VHA Handbook 1100.19
[12] VHA Handbook 1100.19. VetPro is an internet enabled data bank used to credential VHA healthcare practitioners to ensure that credentialing is uniform, accurate and complete. Facility Memorandum 517-2016-11-18, *Credentialing and Privileging of Licensed Independent Practitioners (LIPs),* March 2016.

    a. The "service line medical director reviews the credentialing folder and requested privileges and makes recommendations regarding appointment."[13]

    b. The PSB reviews the credentialing file and the service line medical director's recommendations.[14]

    c. The Clinical Executive Board reviews and submits their final recommendation to the facility director.[15]

    d. The facility director approves the physician's credentials and privileges.[16]

43. The OIG examined Yates credentialing and privileging documents and learned the Credentialing and Privileging Specialist followed VHA policy and reviewed Yates' education, previous employment, background investigation, and licensure.[17]

44. The OIG found that on April 23, 2018,

    a. the facility's PSB reviewed Yates' credentialing and privileging file and determined the appointment qualifications were met,

    b. the facility's Clinical Executive Board reviewed the file and recommended that Yates be appointed as a full-time physician, and

    c. The Associate Director, in the capacity of interim Acting Facility Director, approved Yates' appointment as a full-time physician as the "Approving Authority."[18]

---

[13] Facility Memorandum 514-2016-11-18

[14] Facility Memorandum 517-2019-11-3, *Professional Standards Board for Licensed Independent Practitioners,* November 2019. The PSB reviews and evaluates the qualifications of providers for initial and continued appointment, reviews and recommends individual clinical privileges, and investigates issues related to a provider's clinical or ethical professional conduct.

[15] Facility Memorandum 517-2018-11-2, *Clinical Executive Board,* September 4, 2018. The Chief of Staff chairs the Clinical Executive Board, which acts upon major policy changes and recommendations from clinical service lines, medical center committees and the PSB to include initial appointments and continued privileging of all medical staff.

[16] Facility Memorandum 517-2016-11-18

[17] Dr. Yates held an active license as a Doctor of Osteopathic Medicine in Virginia and West Virginia.

[18] "Leadership Team," Beckley VA Medical Center. The Associate Director is responsible for all non-clinical operations at the facility. The Associate Director served as the Acting Facility Director from April 20, 2018, through April 27, 2018.

45.     The OIG learned that Yates was hired as the facility's Whole Health Medical Director but worked briefly in primary care at the beginning of employment.[19]

46.     The OIG reviewed facility documents and found Yates was credentialed and privileged in the primary care service line with a specialty in family practice and osteopathic medicine.

47.     In additional to family practice, Yates' privileges included the ability to perform osteopathic manipulation treatment (OMT), myofascial techniques, and trigger point therapy.[20]

48.     The OIG concluded that Yates was credentialed and privileged according to VHA and facility policies at the time of appointment.

### *Lack of Credentialing and Privileging to Perform Acupuncture*

49.     However, the OIG found Yates was not credentialed or privileged to perform battlefield or medical acupuncture on patients at the facility.[21]

50.     VHA policy and facility bylaws require providers to formally request a change in privileges including the addition of new privileges.

51.     Providers are responsible for initiating the change and must provide evidence of appropriate credentials and qualifications to support the request.[22]

---

[19] Dr. Yates transitioned from Primary Care to Whole Health on September 28, 2018.
[20] Cleveland Clinic, "Osteopathic Manipulation Treatment (OMT)," accessed October 19, 2021, https://my.clevelandclinic.org/health/treatments/9095-omt-osteopathic-manipulation-treatment. Osteopathic manipulation treatment is hands-on treatment method used to diagnose and prevent disease and improve body function. Cleveland Clinic, "Myofascial Pain Syndrome," accessed October 19, 2021, https://my.clevelandclinic.org/health/diseases/12054-myofascial-pain-syndrome. Myofascial treatment involves identifying and treating pain caused by trigger points, a small bump or knot in the muscle that causes pain, treatment can include the use of trigger point injections. University of Wisconsin-Madison School of Medicine and Public Health, "Trigger Point Dry Needling: On-Point Pain Relief," accessed November 29, 2021, https://www.uwhealth.org/news/trigger-point-dry-needling-on-point-pain-relief. Trigger point therapy is different from acupuncture and involves placing a needle into muscle tissue to reduce pain in muscles, tendons, and joints.
[21] Department of Defense, *Battlefield Acupuncture (BFA) Handbook*, January 2021. Battlefield acupuncture is a technique used to relieve pain and involves inserting semi-permanent needles into the skin of the outer ear at five distinct points.
[22] VHA Handbook 1100.19. Facility, *Bylaws and Rules of the Medical Staff,* 2017, rescinded and replaced with Facility, *Bylaws and Rules of the Medical Staff,* 2020.

52.     The OIG reviewed Yates' credentialing and privileging file and determined his initial privileges did not include battlefield or medical acupuncture.

53.     Additionally, Yates signed an initial privileging memo on March 26, 2018, acknowledging receipt and understanding of the facility bylaws, including the process to request new privileges.

54.     The OIG concluded that although Yates was trained in battlefield and medical acupuncture, he was never credentialed or privileged at the facility to perform either service.

55.     The OIG found that three facility leaders participated in various aspects of Yates' supervision, which led to confusion about who was ultimately responsible for the oversight of Yates' clinical practice.

56.     The OIG also identified deficient supervisory performance evaluations of Yates' professional practice.

57.     The OIG found that the former ADPCS, Debra "Lynn" Legg (2011 – 2020); the former Chief of Staff, Dr. Mark Harris, (2017 to 2019); and the Chief of Primary Care, Lisa Ward and/or Dr. Toni Muncy, participated in aspects of Yates' supervision.

58.     The OIG interviewed current and former facility leaders who provided conflicting information about responsibility for Yates' administrative and clinical supervision.[23]

59.     Per the facility bylaws, the Chief of Staff is ultimately responsible for facility physicians. This includes oversight of the clinical services and credentialing and privileging.[24]

60.     ADPCS Legg denied clinically supervising Yates.

---

[23] The OIG considered administrative supervision to be oversight of organizational requirements, for example, time and leave requests, travel requests, and other clerical responsibilities. The OIG considered clinical supervision to be oversight of the subject's clinical practice, including FPPEs, OPPEs, performance pay, and approval for clinical privileges.
[24] Facility Bylaws.

61.    Former Chief of Staff Harris also denied directly supervising Yates and told the OIG:

    a.   Yates worked in primary care, and

    b.   the Chief of Primary Care was responsible for clinical supervision.[25]

62.    The Chief of Primary Care denied any supervisory responsibility over Yates and reported:

    a.   not being seen as Yates' supervisor by others,

    b.   signing documents including Yates' performance pay and professional practice evaluations, at the request of facility leaders, and

    c.   Yates seeing a small panel of patients in a primary care clinic prior to transitioning full-time to Whole Health.

63.    The OIG determined that the former ADPCS provided administrative supervision for Whole Health.

64.    The OIG could not clearly identify a line of clinical supervision for Yates but noted the former Chief of Staff and the Chief of Primary Care functioned as clinical supervisors and provided varying levels of oversight.

65.    The OIG found that none of the facility leaders responsible for oversight of Yates' clinical practice acknowledged their responsibility for clinical supervision.

66.    Also uncertain about supervision, Yates, in a June 13, 2018, communication to the former Whole Health Program Manager, Oliva Honaker, asked, "are you my supervisor[?]"

---

[25] The former Chief of Staff told the OIG that the Chief of Primary Care supervised Dr. Yates because the Chief of Primary Care was also a Doctor of Osteopathy and because Dr. Yates worked in primary care.

67.     The OIG also learned that following Yates' criminal proceedings in January 2021, the VISN Network Director, Robert Walton, convened an Administrative Investigation Board ["AIB"] in March 2021 to examine the supervision of Yates.[26]

68.     The AIB found Yates was inadequately supervised and concluded that "if supervision of [Yates] was centralized to a physician, that supervisor would have potentially had the opportunity to directly monitor Yates' clinical performance and completion of required documentation."

69.     The OIG concluded that the lack of a clear line of clinical supervision resulted in deficient oversight of Yates' clinical practice.

70.     VHA requires FPPEs and OPPEs to evaluate the competency of practicing providers.[27]

71.     According to The Joint Commission, FPPEs are performed to evaluate the performance of practitioners who are newly privileged or lack documented competencies.

72.     OPPEs are used to evaluate the performance of privileged providers.[28]

---

[26] VA Directive 0700, *Administrative Investigations,* March 25, 2002. This directive was in effect at the time of the events discussed in this report until it was rescinded and replaced by VA Directive 0700, *Administrative Investigative Boards and Fact Findings*, August 10, 2021. The two policies contained the same or similar language related to administrative investigations. When significant incidents occur, VHA conducts administrative investigations to collect an analyze evidence. An AIB is a group of people with the knowledge and expertise to sufficiently review items of concern. The VISN Network Director also charged the AIB members with determining if facility leaders "appropriately" address patient complaints and whether facility leaders executed "due diligence" during the hiring process to gather adverse information about Dr. Yates's past employment.
[27] VHA Handbook 1100.19
[28] The Joint Commission, "Focused Professional Practice Evaluation (FPPE) – Understanding the Requirements," accessed December 13, 2021, https://www.jointcommission.org/standards/standard-faqs/hospital-and-hospital-clinics/medical-staff-ms/000001485/?p=1. The Joint Commission, "Ongoing Professional Practice Evaluation (OPPE) – Understanding the Requirements," accessed December 14, 2021, https://www.jointcommission.org/standards/standard-faqs/critical-access-hospital/medical-staff-ms/000001500/

73.     Facility policy states that "Professional Practice Evaluation is a process that requires monitoring and evaluation of a provider's professional performance to ensure that the provider is delivering safe and high-quality patient care."[29]

74.     Additionally, VHA requires the competency of licensed independent providers to be evaluated by another provider with similar training and privileges.[30]

75.     The OIG found that in November 2018, approximately six months after Yates' start date, the former Whole Health Program Manager, Oliva Honaker, sent an email to the Credentialing and Privileging Specialist to ask if Yates required an OPPE.

76.     The Credentialing and Privileging Specialist responded, "Yes, we need (3) FPPE's for three months (April, May, and June) then [Yates] would convert to OPPE for July to Sept. The next rating period would start Sept 2018 to March 2019."

77.     The email also stated, "[Yates] is Family practice, so will need someone in family practice to review. This is under PCSL [Primary Care Service Line] therefore [Chief of Primary Care] would complete."

78.     The OIG determined the former ADPCS and the Chief of Primary Care did not follow VHA and facility policies when completing Yates' professional practice evaluations including the following deficiencies:[31]

    a.  The former ADPCS, a registered nurse, signed as "Service Chief" although the former ADPCS was not similarly trained.

    b.  Yates did not begin employment at the facility until April 29, 2018, however the evaluation period for the first FPPE was April 15 through April 30, 2018.

---

[29] Facility Memorandum 517-2018-11-1, *Professional Practice Evaluation,* February 2018.
[30] Acting Deputy Under Secretary for Health for Operations and Management VA Memorandum, "Requirements for Peer Review of Solo Practitioners," December 23, 2015.
[31] Facility Memorandum 517-2018-11-2.

    c.  The first and second FPPEs included an assessment of "patient care and procedural skills" through HER reviewed even though the FPPEs stated Yates was not seeing patients during these time periods.

    d.  The fourth FPPE included a review of 11 EHRs and spanned from July through September 2018, although facility policy requires a one-month evaluation period.[32]

    e.  The Chief of Primary Care did not comply with the PSB and Clinical Executive Board's recommendation to establish Yates' initial competency through "chart review, direct observation or conversation with others."

79.    The OIG concluded that the Chief of Primary Care and the former ADPCS failed to provide adequate oversight of Yates' clinical practice through the professional practice evaluation process.

80.    The OIG found multiple deficiencies within Yates' FPPE process, including the former ADPCS participating in the clinical oversight of Yates despite not being similarly trained and the Chief of Primary Care's failure to conduct the minimum number of required chart reviews, comply with the required monthly review periods, and follow the Clinical Executive Board recommendations to establish Yates' initial competency based on chart review, direct observation, or conversations with others.[33]

## I.    Acupuncture: Former Facility Leaders' Awareness and Response

81.    The OIG found that, although Yates was not credentialed and privileged to perform acupuncture, multiple patients reported receiving acupuncture from Yates.

---

[32] Facility Standard Operating Procedure, *Professional Practice Evaluation (PPE) Focused and Ongoing*, February 1, 2018. Facility Memorandum 517-2018-11-1

[33] The OIG learned from the Patient Advocate that this patient never provided a formal statement to the former ADPCS.

82.     The OIG determined former facility leaders became aware of Yates performing acupuncture on patients without required credentials and privileges and did not act per VHA and facility policies.

83.     Specifically, former facility leaders did not ensure disclosures were made to patients potentially impacted and completion of quality management actions such as HER reviews and patient safety reporting.

### OIG Independent Review

84.     The OIG reviewed the 22 EHRs and found Yates documented:

     a.  acupuncture on two patients;

     b.  acupuncture and trigger point treatment on three patients;[34]

     c.  trigger point treatment with the use of needles on one patient;

     d.  trigger point treatment without documentation use of a needle on four patients; and

     e.  no acupuncture or trigger point treatment on 12 patients.

### Facility Leaders' Awareness/Actual Knowledge

85.     During an interview with the OIG, the former ADPCS stated that in November or December of 2018, Yates informed the ADPCS of performing acupuncture on a patient.

86.     The former ADPCS further told the OIG of instructing Yates to stop, as he was not yet credentialed, and then informed the former Facility Director and former Chief of Staff, but no further action was taken.

87.     The OIG learned that on September 30, 2019, which was after the initiation of the criminal investigation against Yates for sexual assaults, the VA Police Chief at the facility wrote

---

[34] The OIG was concerned that Yates did not obtain needles through facility processes. Therefore, OIG's independent review included an examination of Yates' documentation of trigger point treatment to determine if needles were used on patients aside from acupuncture.

in an email, "it was discovered that the Physician was performing undocumented acupuncture procedures on patients without being Re-Credentialed."[35]

88.     Ensuring emails regarding the VA Police Chief notification, on October 2 and 3, 2019, documented the former Acting Facility Director, former ADPCS, and former Chief of Staff's awareness of this information.

### *Lack of Former Facility Leaders' Response*

89.     If an adverse event is discovered through a look-back, facility leaders and staff are required to report the event to the patient safety manager, disclose the event to patients potentially impacted, and offer care to those patients as needed.[36]

90.     The former ADPCS informed the OIG of telling the former Chief of Staff and former Facility Director of Yates performing acupuncture on a patient; however, no further actions were taken.

91.     The former Chief of Staff recalled becoming aware through a "rumor," but was unable to recall any actions taken in response.

92.     Additionally, the OIG found that following the email communication from the VA Police Chief at the facility regarding Yates performing acupuncture on multiple patients, the former Acting Facility Director, former ADPCS, and former Chief of Staff did not:

        a.   initiate a look-back review to determine the occurrence of any adverse events, which the Risk Manager, the Quality Management Chief and the Patient Safety Manager confirmed the OIG,[37]

---

[35] The VA Police Chief provided an email update to the issue brief to facility administrative staff who then forwarded it to facility leaders. The email noted the practice of acupuncture was discovered on September 30, 2019, through patient interviews with VA Police, the Assistant United States Attorney, and the Federal Bureau of Investigation during their investigation of allegations that Dr. Yates sexually assaulted patients.
[36] VHA Directive 1004.08, 2018. VHA Handbook 1050.01, *VHA National Patient Safety Improvement Handbook,* March 4, 2011.
[37] Although the VISN Network Director convened an AIG on March 23, 2021, to investigate processes related to the hiring, on-going supervision, and complaints made "prior to [Dr. Yates's] removal from patient care," the AIG did not include a charge to examine the performance of acupuncture.

b. report the incident to, or consult with, the Patient Safety Manager to review and analyze the risk level associated with the Dr. Yates's actions, and

c. discuss the need for, or perform any, disclosures.

93. The OIG asked former leaders what actions were taken at the facility following the notification from the VA Police Chief.

94. The former ADPCS reported placing priority on the criminal allegations related to sexual assaults as opposed to Yates' use of acupuncture and therefor took no action.

95. As former facility leaders did not report their awareness of Yates performing acupuncture to the Patient Safety Manager, further analysis of the event did not occur.

96. When questioned why a patient safety report was not submitted retroactively, the Patient Safety Manager told the OIG "At the time I would have expected them to do it. Now that all this has been investigated, I would not expect them to put it in now for that event. But at that time they should have."

97. The OIG concluded that upon former facility leaders' awareness of Yates performing acupuncture on patients without the required credentials and privileges, they did not act per VHA and facility requirements related to reporting adverse events, and ensuring the completion of a look-back, and identification of a need for disclosures of adverse events.

***Subject Physician's Access to Needles***

98. The OIG found through the independent review of care that Yates documented the performance of acupuncture and trigger point therapy with needles on six patients.

99. However, the OIG was unable to determine how Yates accessed the needles outside of normal facility ordering processes.

100.    Per the Council of Colleges of Acupuncture and Herbal Medicine, single-use needles kept in sterile packaging must be used to prevent treatment with broken needles and possible transmission of bloodborne pathogens.[38]

101.    The OIG learned that during Yates' employment, the former Whole Health Program Support Assistant managed provider requests for needles.

102.    These requests were sent electronically to the Logistics Department where logistics staff ordered, tracked, and delivered the needles to a locked Whole Health supply closet.

103.    The OIG also learned that providers did not submit their own needle requests.

104.    The OIG reviewed all facility acupuncture needle orders from January 1, 2018, through February 28, 2019, and found an order placed on behalf of Whole Health on February 7, 2019.[39]

105.    Current and former Whole Health staff told the OIG that the February 2019 order was placed for a former Whole Health acupuncturist who began employment on February 3, 2019.[40]

106.    Additionally, the OIG examined needle orders and found Yates did not submit any requests for needles.

107.    The OIG then reviewed the six patients' EHRs in which Yates documented acupuncture and trigger point therapy with needles and determined five of the six patients received treatment with needles prior to the first Whole Health needle order.

---

[38] Council of Colleges of Acupuncture and Oriental Medicine, "Clean Needle Technique," accessed November 29, 2021, https://www.ccaom.org/images/ccaom/Documents/7th_Edition_Manual_English_June_2017.pdf.
[39] The period reviewed encompasses three months prior to Dr. Yates's start date through removal from patient care date. The OIG included the additional months prior to subject physician's start date to analyze whether needles were present in Whole Health prior to Dr. Yates's arrival.
[40] According to a human resources staff members from VISN 5, the former Whole Health Program acupuncturist was employed at the facility from February 3, 2019, through October 15, 2019.

108.    Although Yates documented the performance of acupuncture and trigger point therapy with needles, the OIG was unbale to determine how Yates accessed needles.

109.    The former ADPCS told the OIG of being unable to determine this as well.

110.    Therefore, the OIG is unable to determine if Yates practiced with single-use needles that were kept in sterile packaging.

111.    This raised concerns related to the quality and sterility of needles and possible patient exposure to bloodborne pathogens as the needles were likely obtained outside of normal facility processes.

112.    The OIG determined Yates was hired as the facility's Whole Health Medical Director and credentialed and privileged to practice within the primary care service line.

113.    Yates' privileges also included the ability to perform OMT, myofascial techniques, and trigger point therapy.

114.    However, Yates did not have the credentials and privileges to perform acupuncture.

115.    The OIG identified deficient oversight of Yates' clinical practice.

116.    The OIG interviewed current and former leaders who provided conflicting information about responsibility for Yates' administrative and clinical supervision.

117.    The OIG found that none of the facility leaders responsible for oversight of Yates' practice acknowledged responsibility for clinical supervision.

118.    Yates was also uncertain about who had responsibility for clinical supervision.

119.    The OIG concluded that current and former facility leaders failed to provide adequate oversight of Yates' clinical practice through the professional practice evaluation process.

120.    The facility leaders failed to complete Yates' FPPEs per VHA and facility policies.

121.    The OIG also determined that following Yates' removal from direct patient care in February 2019, and subsequent termination in July 2019, facility leaders did not follow recommended and required VHA and facility polices to timely report to the SLB.

122.    The OIG found that, although not credentialed and privileged to perform acupuncture, Yates documented performing acupuncture on five patients.

123.    The OIG determined former facility leaders became aware of Yates performing acupuncture on patients without required credentials and privileges and did not act per VHA and facility policies.

124.    Specifically, former facility leaders did not ensure disclosures were made to patients potentially impacted, clinical follow-up was initiated, and quality management actions such as HER reviews and patient safety reporting occurred.

125.    The OIG discussed concerns with the VISN Chief Medical Officer, Dr. Raymond Chung, who ultimately ensured a comprehensive look-back review of Yates' patients was performed, the required VHA actions were initiated, including patient disclosures, and VISN facilitated testing for bloodborne pathogens.

126.    The OIG independently reviewed Yates' documented performance of acupuncture and trigger point therapy with needles on six patients.

127.    However, the OIG was unable to determine how Yates accessed the needles, raising concerns related to the quality and sterility of needles and possible patient exposure to bloodborne pathogens as the needles were likely obtained outside of normal facility processes.

128.    During Yates' time as a provider through the Whole Health Program he performed acupuncture on patients including, but not limited to, Plaintiff.

129.    Yates was not credentialed to perform acupuncture.

130.    The acupuncture performed by Yates was neither medically necessary nor performed to the proper standard of care.

131.    As early as November or December of 2018, Beckley VAMC was aware that Yates was performing acupuncture without proper credentials and privileges, as required.

132.    The Associate Director for Patient Care Services told Yates to stop and notified the former Chief of Staff and Facility Director, but took no further action.

133.    Yates was permitted to continue practicing acupuncture on patients without impediment.

134.    In September of 2019, former facility leaders were again informed that Yates continued to perform acupuncture without credentialing.

135.    Yates' method of acupuncture raised concerns relating to the quality and sterility of needles, and possible patient exposure to bloodborne pathogens.

136.    Upon information and belief, Yates' method of acupuncture and failure to adhere to proper procedures for use and exposure of acupuncture needles resulted in actual exposure of Plaintiff to infectious diseases including, but not limited to, Hepatitis B, Hepatitis C, and HIV.

137.    As a result of Yates' unnecessary and unwarranted performance of acupuncture, Plaintiff suffered a physical injury.

138.    As a direct and proximate result of Plaintiff's exposure to infectious diseases, Plaintiff has suffered from emotional distress accompanied by physical manifestations.

139.    Plaintiff did not receive notice of Yates' unnecessary and unwarranted performance of acupuncture and resulting exposure to infectious diseases until November of 2021.

140.    Plaintiff did not plead, release, or have knowledge of any claim arising from Yates' acupuncture at the time of the 2020-2021 case and settlement arising from Yates' other conduct.

## COUNT I
## Negligence

141.    Plaintiff incorporates all prior paragraphs of the Complaint as if fully set forth herein verbatim.

142.    Defendant owed a duty of care to Plaintiff to ensure that its providers, inclusive of Yates, were properly credentialed, privileged, licensed, and monitored.

143.    Yates owed duty of care to Plaintiff to perform only those medical procedures he was properly credentialled, privileged, and licensed to perform.

144.    Yates owed a duty of care to Plaintiff to follow and adhere to proper procedures and protocols for sanitary, single-use of acupuncture needles.

145.    Yates and Defendant breached these duties of care in the treatment of Plaintiff as set forth herein.

146.    As a direct and proximate result of the breaches of the standard of care as set forth herein, Plaintiff has suffered injuries and damages including, but not limited to, medical costs, emotional distress, mental anguish, loss of enjoyment of life, embarrassment, humiliation, and loss of dignity,

## COUNT II
## Negligent Hiring, Supervision, and Retention

147.    Plaintiff hereby incorporates by reference all preceding paragraphs as if set forth fully herein verbatim.

148.    Defendant failed to investigate or adequately investigate the history of Yates.

149.    Prior to hiring or extending privileges to Yates, Defendant failed to train or adequately train Yates and/or failed to adequately supervise Yates.

150.     Defendant knew, or in the exercise of ordinary care, should have known of Yates' improper, uncredentialed, unlicensed and unsanitary practice of acupuncture prior to the occurrences set forth herein or during the course of his employment or holding privileges.

151.     Accordingly, Defendant was negligent in the hiring, selection supervision, training, and retention of Yates.

152.     As a direct and proximate result of Defendant's negligent hiring, supervision, training, and/or retention of Yates, Plaintiff has been damaged and is entitled to recover such damages as set forth more fully herein

## COUNT III
## Declaratory Judgment

153.     Plaintiff hereby incorporates by reference all preceding paragraphs as is set forth fully herein verbatim.

154.     Plaintiff seeks a declaratory judgment, pursuant to Rule 57 of the *Federal Rules of Civil Procedure* and 28 U.S.C. § 2201.

155.     Upon information and belief, Defendant intends to aver that accord and satisfaction bars this or other similarly situated plaintiffs from recovery in this civil action as a result of a settlement reached in June of 2021 and arising from Yates' other conduct respecting Plaintiff and/or other veterans.

156.     The case underlying the 2021 settlement did not plead any improper acupuncture or exposure to infectious diseases and/or Plaintiff was not a party to the case underlying the 2021 settlement.

157.     The June 2021 settlement did not include a release of any claims for improper acupuncture or exposure to infectious diseases.

158.    Plaintiff did not have knowledge of any improper acupuncture or exposure to infectious diseases until November of 2021, after the June 2021 settlement and underlying case were finalized.

159.    Accord and satisfaction requires, among other elements, proof that the creditor accepted payment with knowledge that it was offered upon the condition that the creditor accept the payment in full satisfaction of the disputed claim or not at all. *Haynes v. DaimlerChrysler Corp.*, 220 W.Va. 441 (2011).

160.    In order for the accord to be enforceable, the acceptance must be made "intelligently, realizing the consequences of [the] act and with full knowledge of the relevant facts". *Rauch v. Rubenstein*, 2016 U.S. Dist. Lexis 146116 (S.D.W.Va. 2016).

161.    Plaintiff did not have, and could not reasonably have had, any knowledge of improper acupuncture or exposure to infectious disease until receiving notice of the same in November of 2021, after the settlement of the earlier claims.

162.    Accordingly, Plaintiff seeks a declaration from this court that the earlier settlement did not, and could not, have constituted accord and satisfaction of any claims set forth herein.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendant for:

1. Compensatory damages, past and future;

2. Damages for emotional distress, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss of dignity, past and future;

3. Declaratory judgment as set forth herein;

4. Attorneys' costs and fees; and

5. All other damages as allowable under West Virginia and Federal law.

**PLAINTIFF**
**BY COUNSEL,**

24

/s/ Amanda J. Taylor
Stephen P. New (#7756)
Amanda J. Taylor (#11635)
New, Taylor & Associates
439 Harper Park Dr.
P.O. Box 5516
Beckley, WV 25801
304.250.6017 (P)
304.250.6012 (F)
steve@newtaylorlaw.com
mandy@newtaylorlaw.com